**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:                                    :   Chapter 11
                                          :
ROCK 49TH REST. CORP.,                    :   Case No. 09-14557 (ALG)
                                          :
                          Debtor.         :
------------------------------------------------------------x

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

RATTET, PASTERNAK & GORDON-OLIVER, LLP
Counsel to Debtor
   By:   Jonathan S. Pasternak, Esq.
         Dawn K. Arnold, Esq.
         Julie A. Cvek, Esq.
550 Mamaroneck Avenue
Harrison, New York 10528

JAFFE, ROSS & LIGHT, LLP
Special Landlord/Tenant Counsel to Debtor
   By:   Burton R. Ross, Esq.
880 Third Avenue
New York, New York 10022

LAMBERT & SHACKMAN, PLLC
Counsel to 1251 Americas Associates II, LP
   By:   Thomas C. Lambert, Esq.
         Steven Shackman, Esq.
274 Madison Avenue
New York, New York 10016

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion (the "Motion") by Rock 49th Restaurant Corporation

("Debtor"), pursuant to § 365(a) and (b) of the Bankruptcy Code, to assume a long-term

commercial lease (the "Lease") entered into with the landlord, 1251 Americas Associates II, LP

(the "Landlord"), for the premises (the "Premises") located at 1251 Avenue of the Americas, New York, New York (the "Building"). The Landlord objected to the Motion, and on March 8 and 10, 2010, the Court held a hearing ("Hearing") to determine the following issues: (1) the Debtor's obligation to the Landlord for the cost of steam; and (2) whether there are non-monetary defaults that the Debtor must cure before it can assume the Lease. On March 5, 2010, prior to the Hearing, the parties had stipulated to the amount of pre-petition and post-petition rent due and owing under the Lease (other than for the cost of steam), and the Debtor had deposited the pre-petition amount of $123,166.26 into its attorney's trust account and paid the post-petition amount of $48,870.10.[1]

Based on the following findings of facts and conclusions of law, the Court determines that the Debtor may assume the Lease subject to the conditions more fully set forth below.

## FACTS ESTABLISHED AT TRIAL

The Debtor, which operates a restaurant at the Premises (the "Restaurant"), filed its bankruptcy petition on July 21, 2009. Prior to its petition, the Debtor had been involved in disputes with the Landlord in the State courts, including litigation relating to water leaks (resolved in favor of the Debtor) and electric and work order overcharges (resolved in favor of the Landlord). On December 10, 2009, this Court issued a decision on the Debtor's liability for steam and tax escalation charges, familiarity with which is assumed. *In re Rock 49th Rest. Corp.*, 2009 WL 2892544 (Bankr. S.D.N.Y. Dec. 10, 2009) (Dkt. 78). In brief, as relevant herein, the Court found that a further hearing would be needed to determine the charges for steam supplied

---

[1] These were the stipulated amounts due for monetary defaults. By letter dated March 26, 2010, the Landlord purported to add a claim of $135,000 for attorney's fees incurred in connection with a pre-petition State court action. This claim was not part of the record of the Hearing, is contrary to the parties' stipulation and was not raised at trial, the record of which is closed. It will not be considered on this motion.

to the Premises, and whether the Debtor had requested the steam.[2]  Under the Lease, the cost of the steam used for heating water is the Debtor's responsibility; whereas the Landlord is generally responsible for heating the Premises to 70 degrees, there was a dispute whether steam used for heating purposes was required as a consequence of the default of the Landlord or the Debtor. There was also substantial testimony regarding the condition of the Premises and the existence of non-monetary defaults that, the Landlord argued, violate the Lease and cause unreasonable risk to the Building.

The Lease, dated October 1, 1997, amended March 1, 2003, and expiring on March 31, 2018, provides that the Premises consist of a portion of the ground floor area and concourse area of the Building.  In 1998, the Debtor's previous owner received approval from the Landlord to implement its build out plan to construct the Restaurant (the "Build Out Plan"), including dining and bar areas, a kitchen, and a mezzanine area that, among other things, houses the Restaurant's mechanical equipment. (Landlord's Ex. 11, 12).

The following facts relating to the disputes concerning steam, heating and waterproofing are relevant to a resolution of the Motion.

**Air Tempering System**

The Build Out Plan provided for the Restaurant to be heated in part by twelve finned-tube radiation units (the "FTR Units") around the perimeter windows, which are heated by water the Landlord supplies at its cost.  However, to comply with the Americans with Disability Act (the "ADA"), the Build Out Plan was revised and two of the FTR Units were removed to allow for substitution of doors for windows.  To make up for the missing units, the Build Out Plan called for Beacon Morris Heat Vectors (under floor unit heaters), but it was determined at the time of

---

[2] The Court also found that the Landlord is entitled to additional rent based on tax escalation and the parties have stipulated as to the amount owed.

3

construction that they could not be installed due to the physical limitations of the floor of the Premises. (Tr. 187:7-188:1, Mar.10). In addition, the Build Out Plan called for a cabinet unit heater to be placed above the revolving door at the main entrance to the Restaurant in order to offset incoming cold air. The original cabinet unit heater, however, was removed and never replaced after a fire occurred at the Premises. The Landlord argues that the missing cabinet unit heater has negatively affected the overall heating system because cold air enters through the revolving doors unabated.

The Build Out Plan also provided for the Debtor to furnish an overhead distribution system to connect to the Landlord's heating ventilation and air conditioning system (the "HVAC System"), which supplies air at an average temperature of 55-68 degrees Farenheit, depending on the season and outdoor temperature. The air is blown into the Premises via supply ducts and the Debtor's own system then distributes the air using variable air volume boxes (the "VAV Boxes"). The VAV Boxes, which are linked to thermostats, are designed to open and close in order to control the amounts of air distributed through the Debtor's system. Joseph Rubino ("Rubino"), an engineering consultant hired by the Landlord, testified that some of the Debtor's VAV Boxes function improperly and negatively impact the heating and cooling of the Premises. (Tr. 26:6-17, Mar. 10).

In addition, the Build Out Plan called for an exhaust system to remove odors from the kitchen and vent outside the building, as required by section 4.3 of the Lease. Because this exhaust system creates an area of low pressure in the kitchen, the Debtor provided a make-up air system (the "MAS") to supply a positive stream of air directly into the kitchen and prevent the low pressure from affecting the rest of the Restaurant. The MAS pulls air directly from the outdoors, and the air should be tempered appropriately to keep the kitchen temperature stable. In

its current state, however, the MAS does not interface properly with the exhaust system, as it supplies air straight into the fume hood, where it directly counteracts the exhaust system. Moreover, the effect leaves an unabated negative pressure in the kitchen which results in outside air, *e.g.*, cold air in the winter, being drawn into the Premises. As it exists now, the MAS is not functioning properly.

The Debtor also installed a steam coil in the mezzanine level office; although it was not included in the Build Out Plan, there was testimony that it was known to the Landlord. This steam coil was intended to provide additional heat to the Premises. However, according to Rubino, the steam coil was installed incorrectly, is not properly controlled, and is leaking steam and water. Rubino also testified that the steam coil is ineffective because it releases heated air at the ceiling level (approximately 15 feet above ground level) and thus does little to offset the heating deficiencies. (Tr. 36:9-37:13, Mar. 10). Andrew Silverman ("Silverman"), the Debtor's principal, testified that he had the steam coil fixed on January 23, 2010, and that the heating of the Premises subsequently improved. (Tr. 241:17-242:3, Mar. 10).

**Waterproofing**

In 2004, after a pipeline ruptured in the kitchen, the Debtor undertook extensive renovations to the kitchen area. The Debtor closed the restaurant for approximately three months, waterproofed the kitchen floor, installed four drains, and installed a bathtub-like membrane to protect against leaks. The Debtor also waterproofed the concrete floors of the bar area.

In early 2005, the Landlord delivered a notice of default to the Debtor for failure to cure leaks that it claimed were coming from the mechanical room on the mezzanine level. Substantial litigation between the Landlord and Debtor followed, as the Landlord argued that those leaks

5

constituted a default under sections 4.2(ii) and 4.3(iii) of the Lease. Although the Debtor denied there were defaults, the Debtor employed measures to waterproof the mechanical room, including installing a waterproof membrane covering a portion of the floor and building a dam around the perimeter of the air handling unit. The Landlord insisted that the measures taken by the Debtor were insufficient and that the Debtor was obligated to comply with its own expert's recommendations for waterproofing. There ensued approximately two years of litigation and a trial.

At the State Court trial, the Landlord's expert testified to the following deficiencies: (1) no drain was installed in the floor of the mechanical equipment room; (2) the floor of the mechanical equipment room was not sloping; and (3) the waterproof material should have been, but was not, placed on the entire floor of the mechanical equipment room. Eventually, Judge Scarpulla of the Civil Court of the City of New York issued a comprehensive decision finding that "[Landlord] may not base Lease termination on the [Debtor's] failure to take the specific actions demanded…because neither 4.2 nor 4.3 of the Lease require [the Debtor] to take any of those specific actions." Contrary to the Landlord's contention, the Court further found that the Lease did not incorporate separate building standards, the "Rockefeller Group Standard, Specifications, and Guidelines for Tenant Alterations, Identifications and Displays" (the "Landlord Standards"), issued by the Landlord and amended from time to time. The State Court concluded that the waterproofing in the mechanical room was sufficient to protect against leaks, and that the Debtor had complied with the original Build Out Plan and its obligations under the Lease. Judge Scarpulla's decision of August 1, 2007 was affirmed by the Appellate Term. *1251 Americas Assoc., II, L.P. v. Rock 49th Rest. Corp.*, 886 N.Y.S.2d 71 (N.Y. App. Term 2009).

6

During the instant trial as further discussed below, the Landlord made virtually the same claims as to why the Debtor is in default under the Lease and proposed virtually the same remedies. In addition, the Landlord argued that its requirements for waterproofing extended to the serving area and the employee bathroom on the mezzanine level.

**Steam Allocation**

As further discussed in this Court's December 10, 2009 decision, in June 2008, the Landlord installed a meter to measure the amount of steam provided to the Debtor and started to bill for steam under sections 18.5 and 18.6 of the Lease.[3] At trial, Rubino testified that the steam meter was improperly installed and could not be relied upon. Thus, the Landlord conceded that its prior bills were wrong. Nevertheless, Rubino prepared a report that estimated the amount of steam the Debtor used for various purposes. Rubino's report and his testimony estimates, based on the size of the steam line and "normal" restaurant operations, that the amount owed to the Landlord to heat hot water for the period from August 2008 through February 2010 is $105,122.20. Rubino also estimated the amount of steam used primarily but not exclusively by the steam coil in the mezzanine level office, utilizing the size of the steam pipe, the equipment, and New York City weather data. He determined those amounts to be $37,678.42 pre-petition and $23,840.31 post-petition. Rubino's report also concluded that all steam used in connection with the steam coil and otherwise was unnecessary and could have been avoided had the Debtor properly utilized the Building's HVAC System. The Debtor has challenged Rubino's conclusions and methodology, but it has not provided any alternative calculations.

---

[3] Under section 18.5 of the Lease, "Low pressure steam shall be furnished to the Premises at Landlord's reasonable cost if requested by Tenant." Section 18.6 provides that "Tenant shall be responsible for the costs of all hook-ups for electricity, water or steam, the hookup for electricity to be at a location mutually agreeable to Landlord and Tenant."

7

## II. DISCUSSION

Under § 365(a) of the Bankruptcy Code, a debtor in possession is permitted to assume or reject an executory contract or unexpired lease of the debtor.  Assumption in effect restores the debtor-creditor relationship to pre-default conditions, bringing the lease back into compliance with its terms.  *See In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009).  Assumption is generally subject to court approval based on a review of the totality of the circumstances.  *In re U.S. Wireless Data, Inc.*, 547 F.3d 484, 488 (2d Cir. 2008).  "A bankruptcy court reviewing a trustee's or debtor in possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it."  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993).  Ultimately, a sound assumption decision depends on a debtor's and the court's full awareness of the defaults and the costs of cure.  *See In re U.S. Wireless Data, Inc.*, 547 F.3d at 494-95.  Moreover, an underlying purpose of the statutory scheme of § 365 "is to assist in the debtor's reorganization efforts."  *In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 568 (Bankr. E.D.N.Y. 2008).

If there has been a default under the executory contract or unexpired lease, a debtor must, at the time of the assumption, comply with the three requirements of § 365(b)(1).  First, the debtor must cure (or provide adequate assurance that it will promptly cure) the default.  11 U.S.C. § 365(b)(1)(A).  Second, the debtor must compensate, or provide adequate assurance that the debtor will promptly compensate for any pecuniary loss to such party resulting from such default.  11 U.S.C. § 365(b)(1)(B).  Third, the debtor must provide adequate assurance of future performance under the contract or lease.  11 U.S.C. § 365(b)(1)(C).  We take each subsection in turn.

8

**Non-Monetary Defaults Under the Lease**

The Landlord insists that the testimony of its experts at trial, as to the inadequacy of the waterproofing and HVAC System, has established the existence and extent of defaults under the Lease. As the State Court already ruled in this very case, however, a Landlord's expert's view as to good practice and the Landlord's Standards at the time of trial do not establish a default under the Lease. To identify defaults under the Lease, we start with the Lease, and in this case, with section 2.1 of Exhibit B (the work order), incorporated into the Lease under section 1.6, which states that the "[Debtor] shall furnish to the Landlord, for the Landlord's approval…" a Build Out Plan. The Build Out Plan sets out the controlling standards for the Premises for two reasons. First, the Build Out Plan specifically indicates that it was drawn in compliance with the applicable Landlord Standards at that time. (Tr. 45:15-46:1, Mar. 10). Any non-compliance with the Landlord's Standards at the time was presumably approved by the Landlord.[4]

Second, as the Landlord's expert Rubino testified, leaseholders typically comply with building standards in existence at build out, and any revisions to the standards made by the landlord take effect only in the event of major renovations and only at the time they are carried out. (Tr. 46-47, Mar. 10). This interpretation is in accord with both the State Court holding and sections 5.1(e) and 4.13 of the Lease, which require "approv[al] by the Landlord, such consent or approval not to be unreasonably withheld or delayed provided Tenant complies with the requirements of the Building Guidelines…" when there are any "material changes in the style, quality, service, physical configuration and layout" to the Restaurant. However, where a

---

[4] Under section 1.4(ii) of Exhibit B, the Landlord retains 5% of the construction allowance until the Debtor delivers "copies of the [Debtor's] Plans approved by the Landlord showing the revisions required in the Plans to reflect the changes made to the work during construction because of field conditions." The Landlord has not alleged that the Debtor did not comply with this provision or that any allowance was withheld.

9

material change is not made, even when curing a default under sections 4.2 or 4.3 of the Lease, compliance with current Landlord Standards and the approval of the Landlord is not required.

Based on the foregoing, the Court determines that there are no non-monetary defaults that must be cured to assume the Lease, for the following reasons.

*Waterproofing*

The Landlord argues that before the Debtor may assume the Lease, the Debtor must cure its alleged default under section 4.2 of the Lease to adequately waterproof various areas of the Premises. Section 4.2 provides that:

> Tenant shall not use, or suffer or permit the use of, the Premises or any part thereof in any manner or for any purpose or do, bring or keep anything, or permit anything to be done, brought or kept therein (i) which is in contravention of the certificate of occupancy for the building, or (ii) which interferes with any of the building services or the proper and efficient heating, air conditioning, cleaning or other services of the building or the Premises or interferes with the use of any of the other areas of the building by any of the other tenants of the building or impairs the appearance of the Building; nor shall tenant use, or suffer or permit the use of, the Premises or any part thereof in any manner….

(Lease 4.2). At the Hearing, the evidence established that there has been at most one minor leak affecting the tenant in the space below the Restaurant since the Debtor undertook the waterproofing discussed in the State Court opinion, for which the Landlord has purported to charge the Debtor $2,657.[5] In prior hearings in this case, counsel for the Landlord had constantly referred to "leaks," leading the Court to understand and state on various occasions that this would be an issue that the Debtor would have to deal with. However, the evidence at the Hearing established that there has not been a problem in recent years with respect to actual leaks. Nevertheless, the Landlord claims that the present state of the mechanical room, bar area, service

---

[5] As noted above, the parties stipulated on March 5, 2010 as to the amounts of pre-petition and post-petition rent due pursuant to the Lease, including amounts over Base Rent (but excluding charges for steam). The $2,657 charge, which the Landlord purported to add for the leak, was not included and is disallowed. Not only was this charge not included in the stipulation, but there is no evidence that the Debtor was responsible for even this minor problem.

10

area, kitchen and mezzanine bathroom all create an "unreasonable risk" of leaks to the Premises. According to the Landlord, unless the Debtor complies with the Landlord's experts' recommendations and the Landlord's Standards, the Debtor is in default under the Lease.

The State Court has already rejected this position, and there is authority that its opinion is binding.[6] It is also obviously correct. As the State Court held, even though the Landlord attempted to show at trial there that the waterproofing it had demanded was required under its current Building Standards, "the building standards are not incorporated at all into §§ 4.2 and/or 4.3 of the lease," thus nothing in section 4.2 of the Lease requires the Debtor to perform the specific actions demanded by the Landlord. Nor is the Landlord aided by section 5.1(e) of the Lease, which it now relies on and which provides that the tenant shall:

> Make any changes approved by the landlord pursuant to section 4.13 (a "tenant change") by reputable contractors approved by the Landlord, and in a manner, upon terms and conditions…and at times approved by the Landlord, such consent or approval not to be unreasonably withheld or delayed provided Tenant complies with the requirements of the Building Guidelines for Tenant Alterations issued by Rockefeller Center Management Corporation, as from time to time in effect.

On its face, section 5.1(e) does not include maintenance and repairs made to cure defaults under sections 4.2 or 4.3. Moreover, repairs under those sections would not necessarily imply the types of changes contemplated under section 4.13 of the Lease, which is cross-referenced in section 5.1(e).[7] The Landlord argues that the substantial kitchen renovation implemented after the pipe rupture in 2004 is evidence of the type of work required throughout the Premises to "cure a

---

[6] Under the doctrine of collateral estoppel, issues decided in prior State litigation regarding the right of a debtor to occupy leased space are controlling in determining whether a debtor is entitled to assume a lease, where questions were necessarily decided in prior litigation and there was a right to appeal the State court decisions. *Manhattan King David Rest., Inc. v. Levine*, 154 B.R. 423, 428 (S.D.N.Y. 1993).

[7] Section 4.13 of the Lease states:
> The design and layout of the restaurant to be operated in the Premises, as well as the range of prices to be charged, shall be substantially set forth in the documents identified in Exhibit A hereto. Any change in the name of the restaurant or any material change in the style, quality, service, physical configuration and layout of and signs and graphics for the restaurant, or the type of food to be served and price ranges proposed for the restaurant shall be subject to the approval of the Landlord, not to be unreasonably withheld or delayed, provided the change does not adversely affect operation of a first class restaurant in the Premises.

11

default." Admittedly, the extensive kitchen renovation, which required the Restaurant to close for three months, would be the type of material change contemplated by section 4.13 – a renovation that would implicate section 5.1(e). However, the State Court has already determined that the measures undertaken by the Debtor to cure defaults after the 2004 rupture were sufficient. It held that those repairs did not give the Landlord an excuse to require renovations that, the Landlord asserts, are required under its current Standards.

Moreover, there is no merit whatsoever to the Landlord's assertion that the "mere possibility" of a leak resulting from non-compliance with the Landlord's Standards or proposed remedies is enough to constitute a default. The Landlord cites no authority for this proposition, which would permit any landlord to require a tenant to waterproof a bathroom merely on the possibility that the tenant might let the tub overflow. Section 365 of the Bankruptcy Code does not give a landlord the right to improve its position upon the bankruptcy of a tenant. *In re M. Fine Lumber Co., Inc.*, 383 B.R. at 573. The statute affords no relief to a landlord simply because it might seek to escape the bargain it made. *Id*. Thus, the Landlord cannot oppose the Debtor's assumption of the Lease by requiring a cure that it would not be entitled to outside bankruptcy. The Court finds that the "risk" of leaks is not a default under sections 4.2 or 5.1(e) of the Lease, and that the Debtor is not required to provide a cure prior to assumption.

*Air Tempering System*

At the Hearing there was extensive testimony from the Landlord's expert that the Debtor's air distribution system was not functioning properly. The Court understood that this testimony was introduced to show that the Debtor was solely responsible for the cost of the steam provided by the Landlord for heating purposes. In its decision dated December 10, 2009, the Court set down for a hearing the question of the Debtor's liability for the cost of steam used

12

for both heating and hot water purposes. The Landlord had taken the position that the hot air it provided, together with the FTR Units, was adequate to heat the Premises, and that any steam used for heating was required because of deficiencies in the Debtor's system. The Debtor, on the other hand, took the position that steam for heating was required because of the Landlord's provision of hot air at an inadequate temperature. Nevertheless, in its post-trial papers, the Landlord also argues that the Debtor must cure defaults related to the heating and cooling system in order to assume the Lease. Under section 4.2 of the Lease, the Debtor may not interfere with the efficient heating or air conditioning services of the Building. We therefore deal first with the question whether the Debtor's heating system interferes with the efficient services of the Building.

At the Hearing, the Landlord presented expert testimony that the Debtor's system is not in good order and also, importantly, that it deviates from the Build Out Plan. Some of the Landlord's claims are meritless. For example, the Landlord complains about the two missing RTF Units, but there is no question that the Debtor must comply with ADA regulations and that removal of the units was necessary and approved by the Landlord during construction. It was also shown at trial that Beacon Floor Vectors to replace those units could not be installed. Under the circumstances, the Landlord cannot demand that the Debtor do the impossible.

Nevertheless, the Landlord established that there are serious deficiencies in the Debtor's HVAC system in three respects:

1. The steam coil. Although the Landlord knew that steam coil would be installed in the mezzanine level office to supplement overall heating, the steam coil was not provided for in the Build Out Plan. More important, the Landlord demonstrated that the

13

steam coil often leaks water and steam and is essentially ineffective. Although the Debtor testified that it has taken appropriate steps to fix the steam coil, there is insufficient support in the record that its use is authorized under the Lease.

      2. The VAV Boxes and cabinet unit heater. The VAV Boxes, in their current state, allow an uncontrolled amount of air into the Premises and although it is unclear whether the original cabinet heater was ever functioning properly, it is clear that the Build Out Plans provided for one, and that if it was replaced, it would reduce the heating deficiencies of the Premises.[8]

      3. Ventilation. Lastly, under section 4.3 of the Lease, the Debtor must operate and maintain proper ventilating equipment to discharge fumes, vapors or odors from areas where food and beverage are kept, prepared or dispensed, and do so in a manner where they will not enter the air conditioning or ventilating system of the Building. As discussed above, the Debtor's current MAS is dysfunctional.

It would appear that the Debtor would be advised to correct each of the foregoing deficiencies in its system. Going forward, it is presumed that the Landlord will install a proper functioning meter and will bill for all steam used to make up for any deficiencies. The Landlord established at the Hearing that its provision of tempered air complies with its Lease obligations and that it is the Debtor's own system that has resulted in a need for additional steam. Nevertheless, in order for the inadequacies in the Debtor's system to constitute a default under the Lease, they would have to interfere with the Landlord's system. The Landlord did not demonstrate that the non-functional steam coil, VAV Boxes, the missing cabinet unit heater and the poor ventilation had a substantial negative impact on the Building's HVAC System. These

---

[8] The Landlord's expert stated that the overall heating deficiency of the Premises is 24,483 BTUs, and that the cabinet unit heater would produce 20,000 BTUs of heat. Therefore, the cabinet unit heater would provide approximately 82% (24,483 / 20,000) of the heating deficiency. (Tr. 27:5-19, Mar. 10). The Debtor's witnesses said it would have little impact. Since the cabinet works off of the Landlord's FTR system, heated by water supplied by the Landlord, it would only benefit the Debtor in the long run to replace the unit.

14

deficiencies therefore do not give rise to a material default under the Lease that would prevent assumption.

**Monetary Default - Steam Usage**

Under section 18.5 of the Lease, the Landlord has agreed to provide low pressure steam to the Premises at the Debtor's request at a reasonable cost. The Debtor is currently using low pressure steam to heat hot water and provide certain additional heating to the Premises. As discussed above, this Court, in its December 10, 2009 decision, made a determination as to steam liability. One of the purposes of the Hearing was to determine the amounts owed for the cost of the steam.

Since it was revealed at the Hearing that the steam meter previously used for billing purposes was installed incorrectly and is inaccurate (Tr. 62-64, Mar. 10), all of the bills that had been generated on the basis of readings from that meter were conceded to be unreliable. Nevertheless, the Landlord's expert attempted to provide an alternative method for calculating the amount of steam used by the Debtor. Neither the Debtor nor its expert proposed alternative methods.

To determine the amount of steam used for hot water, Rubino performed the following analysis. First, Rubino determined the maximum amount of steam the hot water heater could use by measuring the diameter of the steam feed pipe and taking into account the temperature and pressure of the steam supplied; the maximum consumption was determined to be 1,800 lbs per hour. Second, using knowledge and experience gained in the course of his professional career, including many restaurant projects, Rubino determined that a conservative average consumption of steam for the dishwasher was 400 lbs per hour, and on average 204 Mlbs per month.[9] Finally,

---

[9] Rubino reached this conclusion by determining that the Restaurant would be in operation 17 hours a day and 30 days per month.

15

the steam rates from the Landlord's steam bills were applied to the average monthly consumption to determine the cost of steam per month.  As a result of this analysis, he calculated the total cost of steam used by the hot water heater for the period from August 2008 to February 2010 was $105,122.20.  Although this is somewhat speculative, it is significantly grounded in the facts in the record and the expert's professional or scientific knowledge or skill, and therefore established with reasonable certainty.  *See Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-51 (1999); *see also Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. 1051, 1069-70 (S.D.N.Y. 1996); *Fang v. Heng Sang Realty Corp.*, 38 A.D.3d 520, 835 N.Y.S.2d 194 (2d Dep't 2007).  It was also unrebutted by the Debtor, which failed to provide any useful evidence as to average daily or monthly operation of the dishwasher.

        To determine the charges for steam used to heat the Premises, Rubino performed an entirely different analysis (Exh. 24).  Rubino did not measure or estimate the steam actually being used, nor could he do so, because of the faulty meter.  He purported to measure the amount of steam that the Debtor would have used as a consequence of the above deficiencies in the Debtor's system. The problem is that the assumptions in his analysis are for the most part pure speculation or contradicted by other evidence in the record.  Thus, Rubino divided his analysis into several parts.  First he attempted to measure usage by virtue of the steam coil during (i) restaurant operation hours and (ii) restaurant non-operating hours.  He assumed the coil was operating constantly during the winter months and based his assumed use of the coil on average temperatures obtained from published sources.  However, Rubino admitted that on two brief visits to the Premises during the winter month of January, he found the coil in use on one occasion and turned off on another.  There is nothing in the record to support his assumption, for

16

example, that the coil would be utilized constantly over six months, resulting in an average use of 1,611.20 Mlbs of steam each month.

The foregoing amounts also appear extreme when compared to the cost of Sunday operation of the "Tenant Supplemental Unit," which Rubino also analyzed. Rubino estimated a much smaller use of steam on Sunday, when the Debtor is responsible for heating under the Lease, and based this on the use of a separate coil in the Debtor's supplemental HVAC system. However, Silverman testified, without contradiction, that the Debtor's supplemental HVAC system has not been in use since May 2008, and that the Debtor has relied on the Landlord to provide additional heating needed that day at a cost of $155 per hour. There was thus no basis whatsoever for this charge.[10]

Based on the foregoing, the Landlord's estimated damages for steam related to heating the Premises are too speculative, and the costs demanded cannot be adequately determined or awarded. *See Coastal Aviation, Inc. v. Commander Aircraft Co.*, 937 F. Supp. at 1069-70. Going forward, the Landlord will be able to reinstall a steam meter and bill for steam accordingly, but on this record it has not established damages for steam supplied for heating purposes.

**Adequate Assurance of Future Performance**

In order to assume the Lease, the Debtor must also provide adequate assurance of future performance of the Lease. To determine whether a debtor has provided adequate assurance, a court must look at the facts and circumstances of each case. *In re M. Fine Lumber Co., Inc.*, 383 B.R. at 572. A debtor in possession need not prove that it will "thrive or make a profit," *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985), or provide "an absolute guarantee

---

[10] Rubino's fourth analysis was based on the use of steam in connection with a presumed use of a cabinet heater and missing FTR Units. However, the cabinet unit heater and FTR Units did not exist at the Premises and even if they did, would have been powered by the Landlord's system.

17

of performance." *In re M. Fine Lumber Co., Inc.*, 383 B.R. at 573. The only assurances the debtor in possession need give is that the rent will be paid and that other lease obligations will be met. *Id.*; *In re Burger Boys, Inc.*, 94 F.3d 255 (2d Cir.1996) (finding a debtor is not required to be current in its past-due lease obligations before the bankruptcy court can authorize assumption of the lease). There is no requirement that the Debtor have filed a plan prior to assumption.

The Debtor is current in both its past and due monetary obligations, except for the payment of $105,122.20 for the cost of steam for heating water, which is further dealt with below. The Debtor has shown that it is able to meet its monthly expenses to the Landlord and otherwise, and that it is operating at a profit. In addition, there is no dispute that the Lease is the Debtor's most valuable asset and essential to its reorganization. The Debtor has expended substantial funds to improve the Restaurant and has represented it expects to file a plan of reorganization shortly at which the Landlord will have an opportunity to be heard. The record is sufficient to demonstrate that the Debtor can provide the Landlord with adequate assurance of future performance.

## CONCLUSION

In order to assume the Lease, the Debtor must cure (or provide adequate assurance that it will promptly cure) any default, monetary and nonmonetary. The statute calls for a prompt cure; "[w]hether a cure is prompt depends on the facts and circumstances of each case." *In re Embers 86th St., Inc.*, 184 B.R. 892, 900 (Bankr. S.D.N.Y. 1995). Under section 12.1© of the Lease, the Debtor is required to either cure a default within twenty days if a cure is possible within that time, or advise the Landlord that it cannot cure in time and act with reasonable dispatch to take steps necessary to cure. Under the Bankruptcy Code, courts have permitted much longer cure periods. *See In re Coors of North Mississippi, Inc.*, 27 B.R. 918, 922 (Bankr. N.D. Miss. 1983)

(permitting debtor to cure a prepetition default totaling between $110,000 and $115,000 over a 36 month period in the debtor's assumption of a beer distributorship).

For the reasons stated above, the alleged waterproofing deficiencies and the problems with the Debtor's HVAC System do not constitute defaults under the Lease requiring a cure before assumption. The Landlord's inability to bill for steam provided for heating purposes is due to its failure to install a properly functioning meter and to be able to measure the use of steam with a reasonable certainty. Thus, the sole default that the Debtor must promptly cure is the payment of $105,122.20 for steam used for hot water. The Debtor must, within 20 days, propose a payment schedule to the Landlord. If there are any disputes with regard thereto, the Court will resolve them on motion. For purposes of this decision, and for the reasons set forth above, the Debtor's Motion to assume the Lease under § 365(a) and (b) of the Bankruptcy Code is granted.

IT IS SO ORDERED.

Dated: New York, New York
       April 7, 2010

                                              */s/ Allan L. Gropper*
                                              UNITED STATES BANKRUPTCY JUDGE